IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch

Civil Action No. 14-cv-01298-RPM

DARREN O'CONNOR,

   Plaintiff,

v.

ANGELA WILLIAMS,

   Defendant.

_____

**MEMORANDUM OPINION AND ORDER**
_____

    Plaintiff Darren O'Connor lives in Boulder, Colorado and is a political activist who focuses on home foreclosure issues. He is an active member of the Colorado Foreclosure Resistance Coalition ("Foreclosure Coalition"). Defendant Angela Williams is a state house representative who represents State House District 7, which covers northeast Denver. Rep. Williams is the chair of the Colorado House Business, Labor, Economic, Workforce Development Committee ("Business Committee").

    During the 2013 legislative session, the Business Committee considered House Bill 13-1249, a piece of legislation designed to reform the state home foreclosure process. O'Connor called Rep. Williams' office to express his and his organization's support for the bill. O'Connor asked to speak personally with Rep. Williams; she did not meet with him or his group. O'Connor and others staged a sit-in in front of her office at the Colorado State Capitol in March 2013.

A hearing was held on the bill on April 13, 2013. Nine members of the Committee, including Rep. Williams, voted against the bill; two members supported it. The Committee then voted 10-1 to postpone the bill indefinitely; Rep. Williams voted to postpone.

Rep. Williams held a town hall meeting at the end of the legislative session in mid-May 2013. Rep. Williams asked Denver Police officers to attend the meeting because she feared for her safety given the failure of House Bill 13-1249. [Doc. 16, Ex. 1 at 23:13-23.] Approximately 50-60 people attended the meeting. O'Connor was one of them. When Rep. Williams was bringing the meeting to a close, O'Connor and another man jumped up and yelled: "Why won't you tell your constituents what happened with House Bill 1249, and why you killed it?" Rep. Williams explained the bill to the attendees and why it did not pass. Following the meeting, a man (not O'Connor) got in Rep. Williams' face and yelled at her (it is not clear regarding what). Police escorted the man from the building. Then, O'Connor approached Rep. Williams and they had a five-minute conversation. O'Connor spoke about six inches from Rep. Williams' face, which made her feel uncomfortable. Rep. Williams asked an observing police officer to escort O'Connor from the building. It is not clear whether the officer did so.

On June 17, 2013, Rep. Williams e-mailed O'Connor to see if he was available for a meeting later in the day. O'Connor responded that that day did not work for him and proposed other dates. Rep. Williams replied that she was not available for one of the several dates O'Connor proposed. O'Connor wrote back to Rep. Williams and proposed additional dates. Rep. Williams did not respond.

Rep. Williams had a town hall meeting scheduled for June 21, 2013 that was cancelled a week in advance. O'Connor did not receive a cancellation notice and went with a group

from Boulder to Denver to attend the meeting only to find out that it was not being held. O'Connor and his fellow advocates instead distributed leaflets throughout Rep. Williams' neighborhood. The leaflets accused Rep. Williams of failing to protect her constituents from fraudulent foreclosures. O'Connor left a leaflet on Rep. Williams' doorstep, along with his business card. O'Connor also posted a message on Rep. Williams' Facebook page stating that he had cancelled plans with his daughter to attend the meeting and that he was upset that the meeting had been cancelled without notice to him.

When Rep. Williams arrived home on the evening of June 21, 2013, she noticed that leaflets from the Foreclosure Coalition and O'Connor's business card had been left on her doorstep. Rep. Williams visited several of her neighbors, who told her that while they had received the Coalition's leaflets, there were no business cards attached. Rep. Williams then contacted other members of the Business Committee. The members she spoke to told her that O'Connor had not contacted them in any way regarding the bill. Rep. Williams contacted the Colorado State Patrol at the State Capitol and the local police to express concern for her safety. She asked the police for extra patrols in her neighborhood. She obtained a concealed carry firearm permit.

On September 21, 2013, Rep. Williams attended the Losing Ground Conference at Manual High School in north-central Denver. O'Connor was in attendance and sat in the fourth row of the crowd while Rep. Williams spoke as a panel member. Rep. Williams notified Michael Calo, a Denver Police officer in attendance, that O'Connor was there. Calo later testified that nothing about O'Connor's behavior at the time caused concern. [Doc. 16, Ex. 1 at 99:4-6.] Rep. Williams left the conference early and did not interact with O'Connor.

Rep. Williams held a town hall meeting on September 23, 2013 in Stapleton that was focused on an upcoming Denver Public Schools board election. She again asked the police to attend. O'Connor attended and sat in the front row. He held up a poster depicting a map of Rep. Williams' district with specific homes highlighted in red to indicate that they had been lost to foreclosure. Rep. Williams asked meeting attendees to put any questions they had on a card and hand them in so the school board candidates could address them. O'Connor submitted a question regarding the impact foreclosures were having on the revenues schools derived from property taxes, but it was not addressed.

As the meeting came to a close, O'Connor approached Rep. Williams and again spoke to her at a close distance. He asked her how many of the submitted questions did not get addressed. Rep. Williams responded that his question did not get addressed because the school board candidates were not responsible for foreclosure-related issues. O'Connor then leaned in and told Rep. Williams that he was going to continue to pressure her until she met with him and answer why she killed House Bill 13-1249. Officer Calo later testified that "I feel absolutely that [O'Connor] infringed upon [Williams'] personal space . . . and got up within inches of her" [Doc. 16, Ex. 1 at 101:19-24]; that O'Connor was very calm and did not use profanity while talking to Williams [id. at 102:8-17]; and that Rep. Williams appeared afraid [id. at 103:21-23]. Observing police officers then asked O'Connor to leave the meeting. He did.

O'Connor posted multiple messages on Rep. Williams' official Facebook page beginning in March 2013 and continuing through the summer. Sometime in August, Rep. Williams blocked O'Connor from being able to post messages on her Facebook page.

On September 24, 2013, O'Connor posted on his personal Facebook page that "Williams has blocked me from her Facebook page. I used to give her credit for at least allowing me to speak out there against her killing House Bill 13-1249 in Colorado." [Doc. 16, Ex. 1 at 35:2-5.] In the same post, O'Connor asked his followers to post a link to a video on Rep. Williams' official Facebook page. Janet Madsen, one of O'Connor's followers, commented on O'Connor's post: "Anything for you. Could you believe how many cops were at her town hall, four inside and three outside." Another follower, Frank Sturgel, then commented: "You don't need cops around unless you've done really bad things." O'Connor himself responded:

> Janet Madsen, I agree. The number of cops was unbelievable. When I confronted her at the end of the meeting, and was pretty harsh with her compared to previous town halls, they didn't bat an eye. While it could change, the fact that we're challenging her, without stepping on everyone else' chance to speak and learn at her events, is hopefully going to drive her crazy.

[Doc. 16, Ex. 1 at 36.] A number of O'Connor's Facebook followers did as he asked and posted the video link on Rep. Williams' Facebook page. The video apparently is of Rep. Williams discussing foreclosure issues.

On October 4, 2013, O'Connor posted on his personal Facebook page: "The pressure on Representative Williams will end when she has an honest discussion about how the banks pressured her to kill legislation that would have protected Coloradans from foreclosure fraud." [Doc. 16, Ex. 1 at 43.]

After Rep. Williams blocked O'Connor on Facebook, O'Connor created a new website, angelarepresentsbanks.wordpress.com, which was a forum for discussions regarding Rep. Williams' handling of House Bill 13-1249. Individuals other than O'Connor posted links to his new website on Rep. Williams' Facebook page.

On October 16, 2013, Rep. Williams filed a verified motion for a civil protection order against O'Connor. [Doc. 1, Ex. 1 at 5.] In the motion, Rep. Williams claimed that she was a victim of stalking and "physical assault, threat, or other situations." [Id.] Rep. Williams stated:

> Since April, 2013, Mr. O'Connor has relentlessly contacted me by phone, by email, through social media, and in person, indicating that the "pressure" will not stop until I meet with him to discuss [House Bill 13-2149]. The legislative session is over. Mr. O'Connor is not one of my constituents. . . . There is no legitimate reason for Mr. O'Connor to continue to contact me by all available methods except to intimidate me, cause me to fear for my personal safety, and cause me to suffer serious emotional distress.

[Doc. 1, Ex. 1 at 5-6.] On the basis of Rep. Williams' *ex parte* motion, Denver County Magistrate Judge Catherine Cary entered the order.

On October 24, 2013, O'Connor posted the content of an e-mail he wrote to Rep. Williams on his Facebook page. The e-mail said:

> While you may be able to keep my voice silent with the presence of four or five police officers, I will continue to respectfully reach out to your constituents with the truth. You can continue to charge the City of Denver for [sic] making you feel safe . . . , but it will not deter me from being present and sharing the truth of your allegiances.

[Doc. 16, Ex. 1 at 46.] An hour later, O'Connor posted another message on his Facebook page: "This is perfect timing, the bankers have decide [sic] to honor Representative Williams on the same day they received my email stating she is clearly working for them. Conflict of interest much." [Doc. 16, Ex. 1 at 48.]

A meeting of the State House District 7 Democrats was held on October 26, 2013. Both Rep. Williams and O'Connor were in attendance. Rep. Williams had police officers present at the meeting serve O'Connor with the temporary protection order and escort him from the building.

A protection order hearing was held on November 13, 2013 before Magistrate Judge Cary. Rep. Williams sought a permanent protection order that O'Connor not come within 30 feet of her or within 100 yards of her home; and not have direct contact with her through phone, e-mail, or social media. [Doc. 16, Ex. 1 at 10:3-23.] At the hearing, Rep. Williams testified that she was seeking the protection order because O'Connor's conduct and comments were aggressive and threatening and she feared for her personal safety. [Doc. 16, Ex. 1 at 59:14-60:14.] Rep. Williams said: "I am constantly, everywhere I go, looking around, making sure that I'm in the safety position possible [sic]. I don't sleep at night. I mean if I hear something outside, I will guarantee you that . . . I wake up and wonder, well, what's going on." [Doc. 16, Ex. 1 at 60:24-61:7.] In concluding his testimony, O'Connor stated:

> I would like for Representative Williams above all to feel safe and to know that I have no interest in making her feel unsafe, so whatever results come out, I hope that her safety and my ability to still be effective on this message can both be accommodated.

[Doc. 16, Ex. 1 at 149:8-13.]

On November 25, Magistrate Judge Cary denied Rep. Williams' request for a permanent protection order. Magistrate Judge Cary stated that she "believes that Representative Williams genuinely feels harassed and intimidated by O'Connor's, frankly, relentless attempts to meet with her." [Doc. 1, Ex. 2 at 12.] Nonetheless, Magistrate Judge Cary determined that O'Connor's conduct was political speech protected by the First Amendment and that entering the permanent protection order as Rep. Williams sought would violate O'Connor's First Amendment rights. [Id. at 12-13.]

In this civil action, O'Connor brings three claims against Rep. Williams pursuant to 42 U.S.C. § 1983: (1) First Amendment retaliation; (2) unreasonable seizure and malicious

prosecution under the Fourth Amendment; and (3) denial of due process and malicious prosecution under the Fourteenth Amendment. Rep. Williams filed a Motion for Judgment on the Pleadings, or, in the Alternative, Motion for Summary Judgment, claiming, *inter alia*, that O'Connor cannot maintain his Section 1983 claims against her because she did not engage in "state action" when she obtained a civil protection order against him, had it served upon him, and later sought a permanent protection order. [Doc. 8.] At a scheduling conference held on August 26, 2014, the Court informed the parties that it would treat Rep. Williams' motion as one for summary judgment. [Doc. 15.] There is no genuine dispute as to the factual background set forth above.

"[P]rivate conduct that is not 'fairly attributable' to the State is simply not actionable under § 1983, . . . however discriminatory or wrongful the conduct is." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995) (citations and quotations omitted). It is "well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." Id. at 493. The key question is whether the state employee committed the tort "on account of the authority vested in the employee by the state." Id. It is the plaintiff's burden to plead, and ultimately establish, "the existence of a 'real nexus' between the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate action was taken 'under color of state law.'" Id. at 494.

O'Connor argues that state action occurred here because Williams "invoked her authority, influence, and position to cause police officers present at [the October 26] meeting" to serve and enforce the protection order; in his view, "[a]n ordinary citizen does not have such police presence at her disposal . . . ." [Doc. 12 at 6.] The civil protection order process is available to every private citizen. See Colo. Rev. Stat. §§ 13-14-1002(1)

8

(referring to legislative goal of improving the "public's access" to protection orders); 13-14-1-4.5 (procedure for temporary civil protection order); 13-14-106 (permanent protection order process). A private citizen with a civil protection order may seek additional police protection and police assistance to serve and enforce a civil protection order. See id. §§ 14-14-107 ("If a respondent has not been personally served with a protection order, a peace officer responding to a call for assistance shall serve a copy of the protection order on the respondent named in the protection order."); 18-6-803.5(3)(a) ("A peace officer shall use every reasonable means to enforce a protection order."). By asking the police to serve O'Connor with the order and remove him from the building, Rep. Williams was exercising authority that was derived from a court order resulting from a process that is available to anyone, regardless of position. Rep. Williams did not, on this record, use her position to gain an advantage in obtaining the temporary order and having it served upon O'Connor.

O'Connor argues that state action can be inferred because "it is presently unknown to Mr. O'Connor whether Rep. Williams paid her lawyers with her own money, with state of Colorado money, or with money raised through campaign contributions." [Doc. 12 at 6 (quoting Doc. 1 ¶ 33).] The use of public funds may or may not be appropriate for this purpose but it is irrelevant to the central question—was Rep. Williams exercising the authority of a state representative in obtaining the temporary protective order? The answer is no.

O'Connor has failed to show a "real nexus" between Rep. Williams' conduct in seeking, obtaining and enforcing the civil protection order and her "badge" of state authority as an elected official. Assuming that Rep. Williams had a retaliatory motive to seek the protection order, there is no liability under 42 U.S.C. § 1983 because there was no state action.

9

Upon the foregoing, it is

ORDERED that Defendant Angela Williams' Motion for Summary Judgment [Doc. 8] is granted. The clerk shall enter judgment dismissing this civil action and awarding Rep. Williams costs.

Dated: November 17, 2014.

BY THE COURT:

**s/Richard P. Matsch**
_____
Richard P. Matsch
Senior District Judge